IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-00207-01-CR-W-DW |
| ) | |
| JOSEPH R. GROOMS, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on the defendant's Motion to Suppress Items Seized From Defendant's Vehicle (doc. #20). For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On June 7, 2005, the Grand Jury returned a three count indictment against defendant Joseph Grooms. Count One charges the defendant with being a felon in possession of firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). Counts Two and Three charge the defendant with possession with intent to distribute a mixture and substance containing a detectable amount of cocaine and methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

On March 2, 2006, an evidentiary hearing was held on defendant's Motion to Suppress Items Seized From Defendant's Vehicle. Defendant Grooms was represented by Carl E. Cornwell. The Government was represented by Assistant United States Attorney Rudolph R. Rhodes, IV. The Government called Corporal Jonathan Dawdy of Westport Public Safety and Officer David Bodenhamer of the Kansas City, Missouri Police Department as witnesses. The defendant did not

call any witnesses.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. Corporal Jonathan Dawdy has been employed by Westport Public Safety patrolling the entertainment district of Westport for almost two years. (Tr. at 2-3) Corporal Dawdy has a four year degree in Criminal Justice from Central Missouri State University and had been working for Westport Public Safety for around 14 months. (Tr. at 12) He has received in-service training from one of his command staff. (Tr. at 12) He carries a weapon, mace and a collapsible baton. (Tr. at 13) His area of authority is the Westport area, and he has the authority to make arrests in that area. (Tr. at 13)

2. On January 28, 2005, Corporal Dawdy was dispatched to America's Pub between 1:00 and 1:30 a.m. (Tr. at 3) The dispatch indicated that there was a party refusing to leave the front door that engaged in verbal threats of going back to his vehicle and retrieving a firearm to use on the doorman. (Tr. at 3)

3. Corporal Dawdy was working with two other officers. They contacted the doorman at America's Pub who gave them a description of the individual who had been refusing to leave. (Tr. at 4) According to the doorman, the individual stated that he was going to go back to his vehicle to retrieve a firearm. (Tr. at 4) The doorman gave Corporal Dawdy and his partners the last known direction of travel. (Tr. at 4)

4. All of the officers got back in the patrol vehicle and proceeded northbound on Mill Street toward the parking garage at 4050 Pennsylvania, the last known direction given by the doorman. (Tr. at 5) At the entrance to the parking garage, Corporal Dawdy saw the party that had been described to them with another party inside a vehicle leaving the parking garage. (Tr. at 5) The vehicle was a dark blue Chevrolet truck. (Tr. at 5)

5. Corporal Dawdy observed the truck proceed southbound on Mill Street. Corporal Dawdy turned his vehicle around and followed the truck. (Tr. at 5) The truck was headed in the direction of America's Pub, and he was following to make sure there was no harm done to any of the doormen. The vehicle however, proceeded eastbound on Westport Road in front of and past America's Pub. (Tr. at 6) After the truck had cleared the area, the patrol vehicle ceased following it. (Tr. at 6)

6. When the Westport security officers were following the defendant's truck eastbound

on Westport Road, they did not stop him because they are not allowed to conduct traffic stops in the street. (Tr. at 19) They did not contact the police to conduct a traffic stop since they believed the individual was leaving the area. (Tr. at 19)

7. About five to six minutes later, Corporal Dawdy saw the same individual in the truck pulling into a parking spot near Panera Bread at 4117 Mill Street. (Tr. at 6) The two individuals in the truck were getting out of the vehicle when Corporal Dawdy and the other officers on patrol stopped. (Tr. at 7) As soon as the Westport patrol officers got out of their patrol vehicle, the driver and passenger immediately shut the doors to the vehicle. (Tr. at 7)

8. Corporal Dawdy immediately placed both of the individuals in handcuffs because of what he had heard about the threats, and immediately called for the Kansas City Missouri Police Department (KCMOPD) to come to the scene. (Tr. at 7- 8) The distance from the parking lot at Panera Bread to America's Pub is about one-half block. (Tr. at 10) It took two to three minutes for Kansas City, Missouri police officers to arrive. (Tr. at 11)

9. The defendant was legally parked in a valid parking spot, without a meter. (Tr. at 16-17)

10. The Westport patrol officers conducted a Terry frisk of the defendant. (Tr. at 18) He did not have any weapons on his person. (Tr. at 18) Corporal Dawdy spoke with the defendant briefly, but did not remember exactly what was said. (Tr. at 19) After the Terry frisk, the defendant was not free to get in his truck. Once the Kansas City, Missouri Police officers arrived, they took over. (Tr. at 20) It was normal procedure to call the KCMOPD to finish an investigation. (Tr. at 20)

11. Officer Bodenhamer of the KCMOPD was called to the area of Westport and Mill Street with respect to a threat made to a bouncer at America's Pub. (Tr. at 22) At the time of his arrival, the defendant was in custody with Westport patrol officers standing next to his vehicle. (Tr. at 22-23)

12. Officer Bodenhamer was advised that the defendant had entered America's Pub with a friend; the friend had been denied access to the bar; the defendant had become upset and had a verbal altercation with some of the bouncers and had said he was going to his truck to get a gun or weapon to use against one of the bouncers. (Tr. at 23)

13. The officer obtained identification from the defendant and ran his name through the computer. The defendant had two outstanding warrants: a moving violation out of Kansas City, Missouri and a warrant issued by the Highway Patrol for failure to secure a load. (Tr. at 23) He was taken into custody on those warrants. (Tr. at 23)

3

14. Identification was obtained from the passenger with Mr. Grooms. He did not have any warrants. As far as the Westport officers were concerned, he was not involved so he was released at the scene. (Tr. at 24)

15. At the time Officer Bodenhamer arrived at the scene, the defendant could not get into his vehicle. He was in handcuffs, the vehicle was locked and the keys had been taken from the defendant. (Tr. at 31-32)

16. According to Officer Bodenhamer, "due to the fact that he was in his vehicle, we conducted an inventory of that vehicle and found the items that were found in the truck." (Tr. at 23)

17. As a result of their inventory of the vehicle, officers found a black hard plastic case which in their experience looked similar to a gun case. (Tr. at 24) Inside the case were two handguns. (Tr. at 24) They also found a gray lock box which was locked. A key was found on a separate key ring in the door of the truck that also contained the defendant's name on a gym membership card. The key gave the officers access to the lockbox. Inside the lockbox, the officers found a large amount of narcotics, a scale and some plastic baggies. (Tr. at 24) Currency was found on the defendant. (Tr. at 24)

18. Prior to the search of the truck, Mr. Grooms was asked if he had any objection to the officers searching his truck. He stated that he did not think the officers had a reason to search his truck and he did not want them to search. (Tr. at 25) Officer Bodenhamer's partner, Officer Hamer, asked the defendant four or five times for permission to search his vehicle. (Tr. at 34-35, 43) Officer Bodenhamer believed that defendant was asked to consent to a search so that officers would have an idea whether there was anything in the vehicle that should not be in the vehicle. (Tr. at 35-36) Officer Bodenhamer did not believe they needed permission to search the vehicle because the suspect was in custody. (Tr. at 35)

19. Officer Bodenhamer testified that he had reviewed the videotape of the car stop (Gov. Ex. 2) and that the videotape fairly and accurately depicted what occurred at the car stop on January 28, 2005.[1] (Tr. at 25)

20. The KCMOPD has a policy for the towing of vehicles. Annex A provides in part:

**GENERAL TOWING REQUIREMENTS**

\* \* \*

---

[1] Defense counsel objected to the officer's terminology in referring to the arrest of the defendant and search of his truck as a "car stop." (Tr. at 25-26)

4

B.  Vehicles shall be towed:

1. On felony arrests when the suspect is the single occupant of a vehicle at the time of the arrest.

2. When the arrested owner/operator refuses to accept one of the following three options:

    a. Drive the vehicle to a police facility after being requested to do so by an officer.

    b. Release the vehicle to a qualified driver.

    c. Sign an Authorization Not To Tow Vehicle, Form 455 P.D., allowing the arresting officer to leave the vehicle legally parked at the arrest scene.

3. When the owner/operator is not considered to be a responsible person, is unable operate the vehicle, and is unable to exercise any of the options listed in Section B, 2 of this annex.

(Gov. Ex. 3)

21. Officer Bodenhamer testified that when he inventoried the vehicle, he was acting under Annex A, subsection B3 of the police department's tow policies because he felt that there were no other options available. (Tr. at 28) Government's Exhibit 4 is the tow report listing items that were left in the vehicle at the time it was towed. (Tr. at 28-29)

22. At the time of the arrest of the defendant, Officer Bodenhamer had been a police officer for approximately a month and a half. (Tr. at 30) Officer Bodenhamer was working with a training partner that evening, Officer Hamer. (Tr. at 30-31)

23. Officer Bodenhamer also frisked the defendant and found he had no weapons on his person. (Tr. at 31) At that point, the defendant could not have gotten back in his vehicle because he was in handcuffs, and the vehicle was locked. (Tr. at 31-32)

24. Officer Bodenhamer acknowledged that defendant's vehicle was legally parked. (Tr. at 37) When asked why the vehicle was towed, Officer Bodenhamer testified:

    A. Because at the time, he was legally parked. Several hours later, the property owner of Westport had the option of towing that car, and it probably would have been towed. It was a busy night. There was a large

5

crowd in Westport. A lot of times cars get left down there. When the property owner has a lot of cars, property owner of Westport has a lot of cars sitting there, he has the option of towing them if they sit there for an extended period of time.

(Tr. at 38)

25. In discussing the policy under which the vehicle was towed, Officer Bodenhamer acknowledged that he did not give the defendant the option of signing an authorization not to tow and allowing the arresting officer to leave the vehicle legally parked at the scene.[2] (Tr. at 41) He did not give the defendant this option because in a few hours the truck would not have been legally parked. (Tr. at 41) The officer did not know whether the defendant's truck was in a parking spot with a time limit. (Tr. at 42)

26. Officer Bodenhamer also believes that there were multiple reasons the vehicle was towed including that the "vehicle is known or believed to have been used in the commission of a crime and has evidentiary value." (Tr. at 42) Officer Bodenhamer also testified that they were able to get in the truck when "we found out [defendant] had a warrant, and he was in that truck." (Tr. at 43)

27. The videotape, Government's Exhibit 2, begins with the Westport patrol officers giving the KCMOPD officers some background about the situation and the information that the defendant would not let the Westport patrol officers search the car. A Kansas City, Missouri police officer then confirms that defendant has a warrant. (See Gov. Ex. 2 beginning at 1:15:15)

28. Subsequently, the dispatcher can be heard confirming the existence of an extraditable warrant. An officer can be heard saying to the defendant: "You have an extraditable warrant that gives me the right to search your car. (See Gov. Ex. 2 beginning at 1:21:41) The officer goes on to tell the defendant they can take him to jail and search his car, but if they are allowed to check in the car and there is nothing in there, they can probably take care of it.[3]

29. Later, the defendant can be heard explaining that some of the boxes in the truck are not his, but those of the "dudes" they had picked up earlier that evening. After some

---

[2] At one point on the tape, it appeared the defendant may be saying that he did not want to leave the truck there.

[3] The Court interpreted these statements to mean that if defendant consented to a search of the truck, and the officers did not find anything, he would not be arrested.

6

discussion between the officers and the defendant about the boxes, an officer can be heard saying something to the effect, "so I got a warrant and can search incident to arrest." (See Gov. Ex. 2 beginning at 1:25:19)

III. LEGAL ANALYSIS

Defendant Grooms seeks to suppress items seized from his vehicle pursuant to the Fourth Amendment and Rule 12 of the Federal Rules of Criminal Procedure. (Motion to Suppress Items Seized From Defendant's Vehicle (doc #20) at 1) In support of his motion, defendant argues that the search was not justified as a search incident to arrest because the officers were in no danger and there was no likelihood that defendant was going to destroy any evidence since he could not access the truck. (Id. at 3) Further, defendant argues that the search was not justified as an inventory search because it did not result from a valid need to secure and tow the truck and because it did not include a tally of all items including those that were not of an incriminating nature. (Id. at 4-6)

The Government argues that the search in this case was justified: (1) as a valid search incident to arrest; (2) to protect the safety of the Kansas City police officers; (3) because the officers had probable cause to believe the truck contained a gun; (4) because defendant had no reasonable expectation of privacy in the gun case; and (5) as a valid inventory search. (Government's Response (doc. #23) at 1)

The testimony at the evidentiary hearing concerning the reasons the defendant's vehicle was searched focused almost exclusively on the inventory search of the vehicle prior to it being towed. However, officers at the scene indicated that the defendant was being arrested pursuant to warrants, and that the vehicle was being searched incident to the arrest. (See Fact Nos. 28 and 29, supra) In the circumstances of this case, the rationale for the search articulated at the time the search was being undertaken, and not the justifications offered in subsequent testimony, is of paramount importance.

7

While generally under the Fourth Amendment police may not conduct a search unless they first convince a neutral magistrate there is probable cause to do so, a number of exceptions to the warrant requirement have been developed, particularly as it relates to the search of automobiles. The Supreme Court in New York v. Belton, 453 U.S. 454, 460 (1981), held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, [footnote omitted] he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile. [footnote omitted]." This ruling is significant in that it does not require the officers to demonstrate that they were in danger to justify the search of the vehicle nor are they limited to searching that area within the immediate control of the defendant and from which he might obtain a weapon. Not only may officers search the passenger compartment of an automobile when they have made a lawful custodial arrest of an occupant of the vehicle, they may also examine the contents of any containers found within the passenger compartment. See United States v. Williams, 165 F.3d 1193, 1195 (8th Cir. 1999).

The majority opinion in Belton reflects a concern that under prior case law, which allowed for the contemporaneous search of the person arrested and the immediate area surrounding them, the police were acting under a set of rules that made it difficult for the person to know the scope of his constitutional protection or for the officer to know the scope of his authority. Id. Thus, the majority opinion in Belton formulated a bright line rule, see Justice Brennan's dissent, 453 U.S. at 463, allowing for a search of the vehicle when the occupant inside the vehicle is arrested.

Subsequently, the Supreme Court clarified that the rule established in Belton is not limited to those situations in which the officer makes contact with the occupant while the occupant is inside the vehicle. It also applies when the officer first makes contact with the arrestee after the latter has

8

exited from the vehicle. See Thornton v. United States, 541 U.S. 615, 617, 620-21 (2004). Thus, the fact that at the time the Kansas City, Missouri police officers arrived at the scene, the defendant was already handcuffed, standing several feet from his vehicle and no longer in possession of the keys to the vehicle, does not prevent the officers from searching the vehicle so long as the search is contemporaneous.

In this case, the tape reflects that the officers began their search of the vehicle less than eight minutes after their arrival. Even though Officer Bodenhamer testified at the suppression hearing that the search of the vehicle was an inventory search in preparation for it being towed, it is clear from a review of the tape that officers at the scene believed the search was being carried out because the defendant was being arrested pursuant to the outstanding warrants. (See Fact Nos. 28 and 29, supra)

Having concluded that the search was permitted under the rationale of Belton and Thorton, the Court need not address the other bases on which government counsel seeks to justify the search of the vehicle.[4]

## IV. CONCLUSION

Based upon the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant's Motion to Suppress Items Seized From

---

[4] In fact, the Court has serious questions as to whether the search can be justified as an inventory search conducted in preparation for towing the vehicle. To uphold an inventory search, the vehicle must be lawfully impounded. Further, the search must be conducted according to standardized police procedures. See United States v. Kennedy, 427 F.3d 1136, 1142-43 (8th Cir. 2005). Here, the vehicle was legally parked, defendant was not arrested on felony warrants and the officers never offered the defendant the opportunity to sign an Authorization Not to Tow Vehicle, Form 455 P.D., as required by the KCMOPD's tow policies. (See Fact No. 20, supra)

9

Defendant's Vehicle (doc. #20).

Counsel are reminded they have ten days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on grounds of plain error or manifest injustice.

<em>/s/ Sarah W. Hays</em><br>
SARAH W. HAYS<br>
UNITED STATES MAGISTRATE JUDGE